**LAW OFFICES OF ERIC A. SHORE**   *Counsel for Plaintiff*
By: <u>CHARLES M. SCOTT, ESQ.</u>
Attorney ID No.: 326926
2 Penn Center, Suite 1240
1500 Market Street
Philadelphia, PA 19102
(267) 262-8586
charless@ericshore.com

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PAIGE L. MAZZACANO**, | : | **COMPLAINT** |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 2:23-cv-1377 |
| **AUTOMOTIVE FINANCIAL SERVICES, LLC** | : | |
| | : | |
| | : | |
| Defendant | : | **JURY TRIAL DEMANDED** |

**<u>CIVIL ACTION COMPLAINT</u>**

Plaintiff, **PAIGE L. MAZZACANO**, by and through counsel, The Law Offices of Eric A. Shore, hereby brings this civil action against Defendant **AUTOMOTIVE FINANCIAL SERVICES, LLC** to recover damages for injuries Plaintiff has suffered, and continues to suffer, as a result of unlawful discrimination, harassment, and retaliation by Defendant against Plaintiff in violation of Americans with Disabilities Act, as amended, 42 U.S.C. §12102 et. seq. ("ADA"). In support thereof, Plaintiff alleges upon information and belief, as follows:

## PARTIES

1. Plaintiff, **PAIGE L. MAZZACANO** (hereafter "Plaintiff"), is an adult female individual and resident of the Commonwealth of Pennsylvania.

2. Defendant **AUTOMOTIVE FINANCIAL SERVICES, LLC** (hereafter "Defendant") is a business entity organized and existing under the laws of the Commonwealth of Pennsylvania.

3. At all times material, Defendant maintained a principal place of business at 4936 York Road, Suites 2000 and 2100, Buckingham, PA 18912.

4. At all times material, Defendant was Plaintiff's employer within the meaning of all applicable law.

5. At all times material, Plaintiff was an employee of Defendant within the meaning of all applicable law.

6. All of the events alleged in this Complaint occurred in the course and scope of Plaintiff's employment with Defendant at 4936 York Road, Suites 2000 and 2100, Buckingham, PA 18912.

7. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendant.

## JURISDICTION & VENUE

8. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331, because Plaintiff's claims arise under federal law.

9. Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendant is subject to personal jurisdiction in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. On June 28, 2022, Plaintiff dual-filed with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") a Charge of Discrimination against Defendant (EEOC Charge No. 530-2022-03205).

11. On January 11, 2023, the EEOC issued a Notice of Right to Sue on Plaintiff's Charge of Discrimination against Defendant (Charge No. 530-2022-03205).

12. Plaintiff's claims under the Pennsylvania Human Relations Act (PHRA) are not ripe because less than one year has elapsed since the PHRC assumed jurisdiction over Plaintiff's claims. Plaintiff intends to seek leave to amend her Complaint to add all claims under the PHRA after one year has elapsed.

## FACTUAL ALLEGATIONS

13. Around March 2021, Defendant hired Plaintiff to the position of Project Manager.

14. Plaintiff was interviewed and hired by Defendant's Chief Executive Officer, Kara Hafer (hereafter "HAFER").

15. At all times material, HAFER was the CEO of Defendant, and held supervisory authority over Plaintiff with respect to all aspects of Plaintiff's employment.

16. At all times material, Defendant did not employ dedicated Human Resources employees, and all Human Resource functions went through HAFER.

17. Defendant did not maintain an employee handbook or any written anti-discrimination, harassment, or retaliation policies.

18. At the time HAFER interviewed Plaintiff, Plaintiff informed HAFER that she had diagnosed speech disorders that affected her ability to speak.

19. As a young child, Plaintiff was diagnosed with speech disorders called disarticulation and disfluency.

20. Plaintiff articulation disorder impacts her ability to produce speech sounds clearly.

21. Plaintiff's disfluency impacts her ability disruption in the flow of spoken language that is caused by the speaker. Stuttering is among the most commonly known disfluency speech disorders.

22. Plaintiff's speech disorders cause Plaintiff to take long pauses when speaking to gather her words.

23. Plaintiff's speech disorders substantially limit her ability to verbally communicate with other people.

24. At all times material, Plaintiff speech disorders were disabilities within the meaning of all applicable law.

25. Moreover, when Plaintiff is under stress or becomes anxious about communicating, her speech disorders become significantly more pronounced, and Plaintiff has to take even longer pauses when speaking.

26. Being criticized or made fun of because of the way she talks is a significant trigger for Plaintiff that only makes it more difficult for her to speak.

27. For the first few months of Plaintiff's employment generally went well, even though it became clear to Plaintiff that HAFER was unpredictable and would lash out against employees when she became frustrated.

28.     Around the Fall of 2021, HAFER began targeting Plaintiff during meetings and conference calls with other employees.

29.     Specifically, HAFER would chastise Plaintiff in front of other employees and then criticize Plaintiff's ability to speak when Plaintiff would try to explain or stand up for herself.

30.     For example, on multiple occasions HAFER would aggressively call Plaintiff out during a meeting or teleconference for something ostensibly work-related.

31.     Then, when Plaintiff tried to respond, HAFER would grow extremely frustrated if Plaintiff had any trouble speaking and would make comments such as "[Plaintiff] I can't understand what you're saying!" or "What are you talking about!?" or "Just do what I say!"

32.     HAFER also frequently interrupted Plaintiff when she tried to speak by saying "What? What? What?" every time Plaintiff tried to start speaking, or HAFER would simply finish Plaintiff's sentence and end the conversation.

33.     HAFER's actions to publicly humiliate Plaintiff for her speech disorders only made it more difficult for Plaintiff to speak, which, in turn, only made HAFER angrier.

34.     At all times material, HAFER did not subject non-disabled employees to similar conduct or comments.

35.     During many of these interactions, HAFER's actions made it impossible for Plaintiff to answer or explain what HAFER had originally asked her.

36.     As a result, HAFER began doubting Plaintiff's work performance and would regularly just tell Plaintiff that something was "wrong" and either humiliate Plaintiff when she tried to speak or just say "Just do what I say."

37.     For example, in December 2021, HAFER conducted a conference call with multiple other employees, including Plaintiff.

38. During the call, HAFER asked Plaintiff to provide her with login information for an account.

39. Plaintiff began trying to explain that she did not have the information HAFER wanted, HAFER lashed out by screaming "YES YOU DO! I KNOW YOU DO!"

40. Plaintiff's speech disorders made it extremely difficult for her to respond, at which time HAFER yelled, "[Plaintiff], I can't understand what you're saying!

41. Embarrassed and humiliated, Plaintiff finally was able to say, "I have a speech impediment!"

42. HAFER dismissed Plaintiff and simply moved on to another topic.

43. In addition to the harassment during phone calls and meetings, HAFER subjected Plaintiff to a different dress code than non-disabled employees.

44. Around December 14, 2021, Plaintiff wore jeans to the office one day as she had seen some of her coworkers do on many occasions.

45. At all times material, Plaintiff had never been informed of a no-jeans policy.

46. Shortly after Plaintiff arrived at work, HAFER came up to Plaintiff and pulled her into a conference room.

47. Once inside, HAFER said "what is up with the jeans? I'm trying to scale this thing and do something that's never been done before. I can't do that when I have people dressing like they don't give a shit about my company."

48. Now struggling to respond, Plaintiff told HAFER, "I do care, and I work hard to fulfill my duties and progress."

49. HAFER immediately snapped back, "Oh, really!? You come in at 8:00am and leave exactly at 4:00pm!"

50. The following day, Plaintiff's coworkers, Quida Wiltshire, and Aimee Morozin (Concierge Callers), both wore jeans to the office and were not reprimanded by HAFER.

51. In fact, Ms. Wiltshire informed Plaintiff that HAFER had complimented her ripped jeans in the past stating, "you look cute!"

52. Between December 2021 through March 2022, HAFER's targeted harassment of Plaintiff because of her disabilities continued.

53. Around March 18, 2022, HAFER texted Plaintiff that the numbers on certain reports were "blatantly wrong" without any explanation of how they were wrong or what HAFER expected of Plaintiff.

54. Later that day, Plaintiff approached HAFER in the conference room and attempted to ask HAFER for a sit down meeting the following Monday.

55. As Plaintiff began to ask, "I was wondering if we could meet to…," her speech disorders made it difficult for her to finish the sentence.

56. As she had done countless times prior, HAFER immediately became frustrated with Plaintiff and snapped, "What!? What, [Plaintiff]!?"

57. Plaintiff eventually finished her sentence but could only muster "to go over dealer reports."

58. HAFER responded angrily, "Yes, but they're all wrong. Do you understand the logic?"

59. Plaintiff replied that she thought she understood the logic and had spent more than 20 hours trying to get them right.

60. HAFER replied, "I don't care. Everything is still wrong."

7

61. Plaintiff walked away after realizing HAFER would only get angrier if she continued the conversation.

62. The following Monday, March 21, 2022, HAFER conducted a teleconference with seven other employees.

63. During the call, HAFER began criticizing Plaintiff about whether the numbers in a report were correct.

64. Plaintiff told HAFER they were correct and challenged HAFER's harassment by asking "Why do you always come at me?"

65. HAFER responded, "It's Monday, don't start with me."

66. Plaintiff continued to oppose HAFER by asking "why would I…" when her speech disorders made it difficult for her to finish the sentence.

67. HAFER then raised her voice and interrupted Plaintiff by stating, "I don't understand what you're saying, [Plaintiff], just look at them later!"

68. After this call, HAFER asked Kip Vaughn and Plaintiff to stay back for a meeting.

69. Once alone with HAFER and Kip Vaughn, HAFER and Plaintiff had the following conversation, in words or substance:

> **HAFER**: "I don't know what your fucking problem is, but it has to stop. You always have a chip on your shoulder and always play the 'she's coming after me' game. Enough!"
>
> **Plaintiff**: "Can I talk for a second?"
>
> **HAFER**: "No! You're either in this or you're out. To me, you're not built for small business. You're built for Corporate America where they worry about their 9-5 tasks and their days off. You come in and work 8-4 and you're out by 4:02. To me, you're an hourly person. I'm trying to scale this thing and do something that's never been done before. I need you to be focused and in the reports thinking strategically."
>
> **Plaintiff**: "I just feel like you have no patience with me when I talk or try to explain anything to you."

8

> **HAFER**: "I don't treat you any different than how I treat anyone else here. You may think you work hard, but everyone else works just as hard. This isn't all about you, Paige."
>
> **Plaintiff**: "I never said it was about me."
>
> **HAFER**: "See, there you go again."

70. Unable to endure HAFER's harassment any longer, Plaintiff ended the meeting and went home for the day.

71. After HAFER verbally berated Plaintiff on March 21, 2022, it became clear to Plaintiff that there was nothing she could do to reason with HAFER, and no one else to turn to make HAFER's discriminatory, retaliatory, and harassing conduct against her stop.

72. Indeed, HAFER was the CEO of the company and there was no Human Resources employee to go to for help.

73. Recognizing that quitting was the only way to get away from HAFER, Plaintiff resigned the next day, March 22, 2022.

74. The above are just some of the examples of unlawful discrimination and retaliation to which Defendant subjected Plaintiff on the basis of her disabilities and/or opposition to Defendant's unlawful employment practices.

75. Plaintiff claims constructive discharge as a direct and proximate result of HAFER's discriminatory, harassing, and retaliatory conduct against her.

76. Plaintiff claims that some or all of the discriminatory, harassing, and retaliatory conduct by Defendant set forth in this Complaint was intentional and unlawfully based on Plaintiff's disabilities and/or Plaintiff's opposition to Defendant's discriminatory employment practices.

77. Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

78. At all times material, Plaintiff acted under a reasonable, good-faith belief that Defendant's actions were unlawfully motivated by Plaintiff's disabilities and violated Plaintiff's legally protected right to be free from discrimination, harassment, and retaliation in the workplace.

79. At all times material, Plaintiff opposed the discriminatory, harassing, and retaliatory conduct by Defendant alleged in this Complaint and made good-faith efforts to take corrective action the through the channels available to her as an employee of Defendant.

80. As CEO of Defendant, HAFER was Defendant's proxy and Defendant is subject to proxy liability for HAFER's actions as alleged herein.

81. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other nonpecuniary losses. Plaintiff has further experienced severe emotional and physical distress and aggravation, activation, and/or exacerbation of any preexisting condition.

82. In the event Defendant claims or a Court determines that Plaintiff is an Independent Contractor, Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendants owed and breach its duty to Plaintiff to prevent the harassment/discrimination/retaliation and are liable therefore for negligence.

**[INTENTIONALLY LEFT BLANK]**

## COUNT I
### Disability Discrimination in Violation of The
### Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112
*Plaintiff v. Defendant*

83. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

84. The ADA prohibits discrimination on the basis of a disability, and provides:

> **(a) General rule**
> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

85. At all times material, Plaintiff was a qualified individual with a disability entitled to the protections of the ADA.

86. At all times material, Defendant, by and through HAFER as proxy, had actual knowledge of Plaintiff's status as a qualified individual disability entitled to the protections of the ADA.

87. It is alleged upon information and belief that HAFER subjected Plaintiff to adverse employment actions, including but not limited to, denying Plaintiff compensation, job training, and other terms, conditions, and privileges of employment, and causing Plaintiff's constructive discharge.

88. At all times material, Plaintiff's disability was the motivating and/or determinative factor in HAFER's decision to take adverse employment actions against Plaintiff.

89. HAFER's actions to take adverse employment actions against Plaintiff because of Plaintiff's disability are unlawful employment practices in violation of the ADA.

90. HAFER's unlawful actions alleged herein were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

91. At all times material, HAFER acted in her capacity as proxy of Defendant, and Defendant is therefore liable for HAFER's unlawful actions.

92. As a direct and proximate result of Defendant's unlawful employment practices in violation of the ADA, Plaintiff has suffered and continues to suffer emotional and financial harm.

## COUNT II
### Hostile Work Environment in Violation of the
### Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102 *et. seq.*
*Plaintiff v. Defendant*

93. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

94. At all times material, Plaintiff was a qualified individual with a disability entitled to the protections of the ADA.

95. At all times material, Defendant, by and through HAFER as proxy, had actual knowledge of Plaintiff's status as a qualified individual disability entitled to the protections of the ADA.

96. HAFER, in her capacity as CEO and proxy of Defendant, subjected Plaintiff to unwelcome harassment unlawfully motivated by Plaintiff's disability.

97. HAFER's harassment was sufficiently severe or pervasive to create a hostile work environment.

98. At all times material, Plaintiff believed her work environment was hostile and abusive.

99. The unlawful hostile work environment HAFER created culminated in Plaintiff's constructive discharge on March 22, 2022.

100. HAFER's actions to subject Plaintiff to unwelcome harassment motivated by Plaintiff's disability is an unlawful employment practice in violation of the ADA.

101. At all times material, HAFER acted in her capacity as proxy of Defendant, and Defendant is therefore liable for HAFER's unlawful actions.

102. Defendant's unlawful actions as alleged herein were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

103. As a direct and proximate result of Defendant's unlawful employment practices in violation of the ADA, Plaintiff has suffered and continues to suffer emotional and financial harm.

### COUNT III
### Retaliation in Violation of the
### Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a)
*Plaintiff v. Defendant*

104. Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

105. Section 503 of the ADA prohibits retaliation, and provides:

> **(a) Retaliation**
>
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

106. Plaintiff engaged protected activity under the ADA including, but not limited to notifying HAFER of her disability and opposing HAFER's discriminatory and harassing actions against her.

107. At all times material, Plaintiff acted under a reasonable, good faith belief that her right to be free from discrimination and harassment on the basis of a disability was violated.

108. It is alleged upon information and belief that, after Plaintiff engaged in protected activity, HAFER subjected Plaintiff to materially adverse employment actions, including but not limited to verbal abuse, denial of training and advancement opportunities, and causing Plaintiff's constructive discharge.

109. At all times material, Plaintiff's protected activity was the motivating and/or determinative factor in HAFER's decision to take materially adverse actions against Plaintiff.

110. The temporal proximity between Plaintiff's protected activity and HAFER's actions to take materially adverse employment action against Plaintiff is unusually suggestive of a retaliatory motive and gives rise to an inference of causation.

111. HAFER's actions to take materially adverse actions against Plaintiff in retaliation for Plaintiff's protected activity are unlawful employment practices in violation of the ADA.

112. HAFER's unlawful actions alleged herein were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

113. At all times material, HAFER acted in her capacity as proxy of Defendant, and Defendant is therefore liable for HAFER's unlawful actions.

114. As a direct and proximate result of Defendant's unlawful employment practices in violation of the ADA, Plaintiff has suffered and continues to suffer emotional and financial harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against the named Defendant, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, statutory damages, attorneys' fees, costs, interest, and disbursements of action; and for such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.

Dated: <u>April 11, 2023</u>          **LAW OFFICES OF ERIC A. SHORE**

          **CHARLES M. SCOTT, ESQUIRE**
          Attorney ID No.: 326926
          2 Penn Center, Suite 1240
          1500 Market Street
          Philadelphia, PA 19102
          (267) 262-8586
          charless@ericshore.com
          *Attorney for Plaintiff*